Exxon Mobil Corporation v. Corporacion CIMEX, S.A. Cuba Exxon Mobil Corporation v. Corporacion CIMEX, S.A. Panama and Union Cuba Petroleum Mr. Krinsky for the Exxon Mobil Corporation Mr. Davidson for the Exxon Mobil Corporation Good morning, Council. Mr. Krinsky, please proceed when you're ready. May I please reserve a few minutes for... Would you do me a favor and can you lower the mic a little bit? Better? Yes. Thank you. Maybe the two mics at the side also. Okay. Perfect. Better? Yes. Okay. Thank you. Plaintiff Exxon Mobil sues for trafficking in expropriated property under Title III of the Helmsburg Act. In 1960, Cuba expropriated an oil refinery owned by SOSA, a Panamanian corporation, a subsidiary of Plaintiff, and also its oil service stations in Cuba. The property remains the property of the Cuban state itself. Plaintiff alleges that the Council of Ministers of Cuba put defendant Coupet's predecessors in possession of the property and then Coupet for its operation and that it did the same with respect to the oil service stations and Coupet, defendant Coupet. We argue that the expropriation exception alone controls this action and therefore the district court should have dismissed the action rather than continue the action of commercial activity exception. We argue that the expropriation exception alone controls the action for basically three reasons. The first is that the acts upon which Coupet and CEMEX are being held liable are part and parcel of Cuba's exercise of sovereign authority and therefore the case belongs only within the expropriation exception. The second reason is statutory construction. The third is international law. As to the first, liability under Title 3, Coupet and CEMEX's liability under Title 3, arises from their possession or their use for both of the expropriated property. But in having the property in their possession and using it commercially, they are simply exercising Coupet's exercise. They're simply implementing, I should say, Coupet's exercise of sovereign authority. It's sovereign authority over the disposition of its own property. It's sovereign authority over the disposition of expropriated property. And it's sovereign authority to place this property within its socialist economic system by keeping it within the state sector. Mr. Quincy, can I ask you in just pushing forward under the expropriation exception, is it your view that Barcelona Traction forecloses the possibility that Exxon might have rights under what we call municipal law in the international law context, that it might have rights under, let's say, Panamanian law? No. Well, I think it doesn't matter. I think the question in a sense doesn't matter because it does not have any rights under international law, Panamanian law, or property rights under international law, Panamanian law, or U.S. law. Well, I'm thinking to the extent that shareholders have a right to consent and the expropriation was taken in violation of that right, I mean, if the argument is Barcelona Traction forecloses a finding that this expropriation was in violation of international law, I guess the question is does Barcelona Traction cover the situation in which the shareholder's interest might actually rise to the level of a legal right that is taken? On the Panamanian law, which I know Frances has raised in one sentence, and it's only in its recovery, I do want to point out that we believe that was waived. We argued Panamanian law did not provide rights in judicial court. We put in an expert after David. Understood, but on its merits, were we to reach it?  On its merits. I do not think Barcelona Traction precludes there being shareholder rights under municipal law. I don't think, personally, the point wasn't raised and wasn't argued and was waived, and it's really serious. We put in an expert after David and there was no response at all from the plaintiff. The provision itself, the right that was given under that provision was not taken away. They still had the right as shareholder to authorize or not the board of directors to dispose of its property for whatever property they had. It's similar to the situation with the Barcelona right of, shareholder right of, right to residual assets after liquidation. Well, if there's expropriation, there's less residual assets, but still you're right, the residual assets that remain as a shareholder were not taken. So we would argue on a point that was never raised before that this right and the Panamanian law. The other point is that- But then it sounds like you are saying that Barcelona Traction precludes the recognition here of any municipal shareholder rights under Panamanian law. For example, the right to consent. It sounds like you think that is foreclosed by Barcelona Traction. Well, it is- For the reason that you just said, that they only have the right insofar as they have the property. It's precluded by Barcelona Traction in this sense, Your Honor, I would say. Barcelona Traction recognizes that in municipal systems and as customary international law, it's a basic separation between the right of the corporation and the right of the shareholder. And if you would take a provision such as what we're talking about here, that they cited in their reply brief, and we can show it as upsetting that basic structure, then I think it would be in conflict with Barcelona Traction. You started talking about Title III and now you're flipping into some notion of international law. Isn't international law totally irrelevant to a claim under Title III? It's not irrelevant, Your Honor, to the Foreign Sovereign Community Act. I know. But under Title III, I mean, one of the things you said is this is not property under United States law. Title III is United States law, isn't it? And let me finish. One of the findings that Congress made in passing Title III was that international law was inadequate with respect to the confiscations that were occurring in Cuba. And I think it's sub-8 or sub-9 or sub-10, all those findings. And property is defined as including securities in Title III. So Title III, it seems to me, number one, does not depend on international law. And number two, defines property in a way that's absolutely inconsistent with your argument. Well, first, Your Honor, to go back to what I was about to say, Title III did not amend the Sovereign Immunities Act. What? It did not amend the Foreign Sovereign Immunities Act. There was a provision in it originally to amend the Foreign Sovereign Immunities Act, but it was short. So we are left to apply the Foreign Sovereign Immunities Act. Congress determined that any action under Title III against an agency must meet the requirements of the Foreign Sovereign Immunities Act. Where does that determination come from? I don't see that. I've read Title III. You say that Congress determined Title III is subject to the immunity requirements? Yes, Your Honor. There was a provision in the bill that said actions under Title III are exempt from immunity. And it was withdrawn. So which bill? It was in the House. Well, the House bill was what originally went forward. It could have been withdrawn simply because it was unnecessary. And the reason it was unnecessary is the same reason we gave in the Miller case, that this is not simply a cause of action. It's an action that says the Cuban agents are liable if the property has been confiscated and is being trafficked, which is namely being used. And that defines what the liability is. And now, Your Honor, the reason why there was a waiver of immunity on the basis of that statute is that otherwise that statute would be a dead letter. It would be meaningless. It would be senseless. That's not so here, Your Honor. Plaintiffs can sue. In fact, plaintiffs have sued under Title III within the constraints of the Foreign Sovereign Immunities Act. And its requirements must be met. One of the requirements is that there be a particular kind of right at issue in the expropriation section, a property right. Title III only gives damages. It doesn't create a right in the property. Have there been non-state defendants in Title III cases? There are a ton of them, Your Honor, in Florida, yes, Your Honor. And they are different than us because they entered into a relationship with the expropriated property, if you will, through a simple contractual relationship. A carnival cruise docks at a wharf in Havana and disembarks its passengers over a confiscated wharf. But that is separated from the expropriated property. There's no FSIA issue in that kind of case. Exactly. This is the first case. And I would point out the agency provision of the Title III doesn't apply just to Cuba. I mean, French state agencies, English, Canadian, and so forth. All of which are part of the ambit of Title III. Title III only applies to Cuban states. No, Your Honor. I don't believe that's true. Any person who traffics in confiscated property. The expropriation has to have been done by the Cuban. Yes, Your Honor. It's a Cuban issue. And you keep talking about sovereign authority. I don't think there's any dispute about sovereign authority. The United States has sovereign authority to take property. The question is whether it's a violation of international law to take the property and not compensate the person that owned it. That's the question. It's not the question of exercise of sovereign authority. I believe that's right, Your Honor. And that's why the expropriation exception applies under the expropriation exception. And it alone is where Congress said we are going to make a weighing decision that we are going to allow a suit on the basis of a sovereign act. But when you say, I mean, obviously you don't think the expropriation exception is met. When you say it applies, what you're saying is there's only one conceivable way. Yes, exactly. If you go forward, it would be under expropriation. Why is that? Right. I mean, but why? I don't understand why that would be the right way to read the act. Even if you could conceive of this case as an expropriation case, and obviously there's ways in which one could. Title III even talks about the original expropriation as distinguished from the ongoing trafficking. It could be conceived of that way, but there's also another exception that's potentially in play. It just seems like the natural way you read that statute. There's multiple exceptions. You kind of go down the list and see if any of them applies. That may be the case in a situation in other cases, Your Honor, but I would suggest this is fundamentally different. Because, and the reason is, it's really expressed in a wrong way than any vote. It's the same fact. There is no separation here between what the agency is doing that makes it liable and through this exercise of sovereign authority. Rankin, Wrong, and Avengo recognize the transfer, the state's transfer of expropriated property to an agency for its commercial use is a sovereign, not a commercial act. Well, if one end of that same transfer is sovereign, then surely the other end has to be sovereign as well. It's part and parcel of the same sovereign transaction, a transfer of property. And here, what's more, it's a transfer of the state's property. So, I mean, if the United States puts part of the Colorado River in the hands of the Tennessee Valley Authority, the Tennessee Valley Authority carrying out its mandate, that's a sovereign exercise of authority. Not Colorado carries it out. It's not a contract. It's not an independent act. But it is part and parcel of the same sovereign exercise of authority. What about Dissepol, where there was a sovereign act of confiscation, but then we've applied the commercial activities exception? Because there was a contract. They were suing on a contract, on a bailment agreement. I hear that. There's trafficking. There's trafficking. There's use of expropriated property to run a business. Yes, Your Honor, but that's different than… In the bailment, there was a bailment that arose as a matter of law. It wasn't like they wrote it out. There was a bailment. Well, matter of law or not, there was a bailment. Here, there is nothing more, nothing more than the state, the agency having in its possession, being put in possession of property and being told to use it for commercial use. It's not about how they are using it. It's not about how they are… It's no independent tort. It's not about a contract. It's nothing independent on that exercise of sovereign authority. I think the district court went off in the wrong direction when it asked whether the act is in connection with a commercial activity. But Nelson said all that, well, if the act is sovereign, it doesn't matter whether or not it's in connection with a commercial activity. It's still sovereign, and that's what we have here. Suppose, for example, suppose that what happens, the trafficking that's alleged, the commercial trafficking that's alleged involves the issuance of bonds. And the action is that, well, you issued some bonds, and now you're reneging on the bonds because you're extending the time frame. And it all happens on expropriated property. It's obvious under Weltover that it would be the commercial activities exception. Yes, you're wrong, but it would be. That's how the state participates or the agency participates in the marketplace. What we're talking about is a solid decision about not how you participate, but who participates in the Cuban economy with what property. And those are sovereign acts. What if Cuba had issued a regulation that said only state enterprises can use expropriated property? Well, surely we would recognize that's the flip side of Weltover. That's the part that Weltover recognized as sovereign. So that's what essentially they did. It probably is a regulation somewhere, but it probably, instead of passing a regulation saying only state enterprises can use oil refineries, they gave it to a state enterprise and said, you possess it. You run it. It's the same exercise of sovereign authority. But I don't think the question is who. I think it is how. For example, in the Decepol case, I think the government of Hungary made an argument about the trains and the museum being part of the state. And we looked at the function, not at the who, but at the how. You know, these are things that can be in our functions that can be in our carried out commercially. And that seems like that's a robust and well-established strand in both cases and ours. There may have been a factor on the arguments, but the decision rested very explicitly on there being a bailment agreement. A bailment agreement is a contract. It comes within the restrictive theory of immunity. There are many contracts by these state enterprises. CMAX is entering into contracts. But that's not what makes them liable. What makes them liable, what Helmsberg does is makes them liable for possessing property given to them by the state or using the property given to them by the state. Right, and using – Using the property that you give them to the state. I know, but still, it could be a subsequent purchaser, a subsequent person who has control over the property. And using is just commercially using it in the way that any private party might commercially – selling goods. It's not a private party when you're carrying out the state's exercise of authority, of sovereign authority, to dispose of its property, dispose of expropriated property, to keep property within the public sector. Look what we would be saying if this is not a sovereign act. We would be saying that Cuba cannot, in its exercise of sovereign authority, structure its economy to have its oil refineries, key industries within the state sector. So even if we think – even if we were to accept this argument, the upshot of which is that the relevant acts in issue are sovereign acts. Yes. If you still apply the commercial activity exception and reach that conclusion, you would just say under the commercial activity exception at the first step. It doesn't constitute commercial activity. It constitutes – it sounds to me like that's the upshot of your argument. That doesn't mean that you only apply the expropriation. I think not, Your Honor. I think if the act is sovereign in character, which we maintain it is, it doesn't matter whether it's also in connection with commercial activity. In Tehran, Your Honor, I mean, which was a very strong case in Tehran, in Tehran there was the state's property and there was actually a contract, a concession. But – and then it was – we agreed to that contract. The court nonetheless – this court nonetheless said this is a – this is within the expropriation exception, not the commercial activity exception. Here we're stronger. We're not – we don't have – there's no contract. They're not suing on a contract. They're suing on the poor, bare, naked, sovereign act of the agency being told, here, you take this property and you use it commercially. And that happens all the time. That's exactly what happened since 1917 with expropriated properties. Is Tehran a precedential decision of this court? I'm sorry. I don't know why my microphone is not effective. But is Tehran a precedential decision of this court? No, Your Honor. I think not. And that is a sovereign act. So can I take you – just to go to another step of the argument. I know you've made an enthusiastic and forceful submission that we have to do this under the expropriation exception and that it's a sovereign act. But let's just assume for argument purposes you'll resist the assumption. But assume for argument purposes that – not persuaded by that. I'm not saying I'm not. But let's just assume that I'm not for present purposes. And we apply the commercial activity exception. We're in that agreement. Yes, I'm going to go ahead. I don't want to confuse the time. Yeah. And so on that, let me just ask you the question. So the district court had two particular channels through which it concluded that the commercial activity exception satisfied, one of which was the remittances and one of which was the sale of U.S. imported goods at the station. And just to focus on the remittances for a second. So on the remittances, if it's true that the SOSA – is that how you – SOSA. Yeah. Okay. If there's an entire program designed to get remittances from U.S. persons so that persons from the U.S. can send funds to persons in Cuba, then does it not just necessarily follow that there's a direct effect in the U.S. as a consequence of creating and maintaining that program? The problem is that there were only 4 to 10, and post 4 to 10, out of 504 remittance locations on SOS land. Only 4 to 10 out of 500. So on that, if that's your main response, then that doesn't surprise me that that would be a main ingredient in your response. So let's just suppose that in those – let's just assume 4 to 10. I mean, I think there will be a response that says, well, if there's more discovery, maybe we'll find out there's more than 4 to 10. But let's just stay in 4 to 10 land. So in 4 to 10 land, if one of those four – let's just give you the benefit of the four. If one of those four is processing millions of dollars in remittances, then if you're past the triviality threshold of weltover and millions of dollars, well, weltover tells us it doesn't need to be substantial. Then why isn't that enough? Even if it's only one, I'll just give you the benefit of one. Why isn't it enough? We don't know how much any particular station is processing. Why isn't it enough? I respectfully want to answer the wrong question. The question is whether the 4 to 10 was the cause of the remittances flowing. And the district court did not make that finding in this role. And what we think the court should do is either demand for the court to address that question of whether the 4 to 10 is the cause. Of course, we say possibly close, but it really doesn't matter at this moment. It's the cause of the remittances flowing. We don't think it's plausible 4 out of 504. And by the way, Exxon has a list, let's say, of remittance locations. It could say it's more than 4 to 10, but they haven't said that. The assumption is false. The causality. The causality, the 4 to 10, I get that for purposes of Title III. But for the FSIA, all that matters is if the act causes a direct effect in the U.S. But it didn't. The district court never addressed the 4 to 10. He didn't address it. He respectfully missed the boat. He said, well, there was a contract between Western Union and Finsey Mess, a related company. All those have a channel of communication and remittances flow. But the question then is, does the 4 to 10 cause, part of the cause, we say possibly close, but anyway, cause Western Union and Finsey Mess to enter into that contract? That's the question. Because it's the contract that makes the remittances flow. And that there's 4 to 10, we say, the district court didn't say it, and Exxon doesn't even address it. Exxon does not even argue, didn't argue below, didn't argue here, that the 4 to 10 were a cause of opening up this channel of remittances. The district court asked, well, asked the wrong question. It didn't focus on the 4 to 10. Suppose it's 100%. I think that would be a harder question to answer. Let me just finish. I'm not asking if it's a harder question. I'm asking whether, under your argument, you would still say, even if every single facility was one in which remittances were coming from the U.S. to Cuba, are those facilities causing the remittances to flow? I think we would have to ask, Your Honor, whether there was an intermediate act, an individual assessment by Western Union that, or whether it was really relying on those 504 locations. I think that would be the factual inquiry. It's a hard, but I'd come back to it. Excuse me. I'm hung up on this, and I'm sorry to interrupt you. But, you know, I've been overseas and received Western Union wires and facilities, but it was always Western Union had a separate office. Is that the same in Cuba with respect to these 711s? There's a sign on the door. On the auto service station door, they sell gas, and there's a sign on the door that says Western Union. But is there a Western Union office in there with a Western Union? Western Union appointed CEMEX as its agent in Cuba to distribute remittances, and CEMEX appointed three sub-agents to do that. CEMEX is one of them. The three sub-agents provide 504 locations. Only 4 to 10, the actual number is 4 to 10 is on SOS land. So just following up from Judge Randolph's question, it's more like when you buy a lottery ticket from a retail outlet in the United States. They have a sign on the door that they sell them. You go to the cash register, and they will process the lottery tickets from their – just as part of their products that they sell, right? So it's not a separate office. But it is the – I mean, what I find challenging for you about the commercial activity exception, both with foodstuffs and with the remittances, is two things. The Title III claim is very broad. The Title III authorization for private right of action, using the expropriated property in – putting it to commercial use, very broad. And then the type of outfit that we have here, these sort of convenience stores that do a lot of things, including, in some cases, process remittances, sell various goods, including, the evidence suggests, in some cases, U.S. goods. So it seems like maybe an unusual case, but why shouldn't we find that the direct effects on the U.S., of purchasing U.S. goods and processing U.S. remittances, are related to the gravamen of the claim, that commercial activity of running convenience stores, and the direct effect of doing so, insofar as, if they weren't running those convenience stores, at least some of that type of business would no longer be coming into Cuba? Yes, Your Honor. Maybe that should be the finding, but it wasn't the finding. The district court didn't focus on the right question. Where is the causality for using expropriated property? And maybe the district court will decide on the evidence, on current evidence, or on additional evidence, that it is causality requirement is met, but the district court didn't do it. And so we should have a remand for the district court to make, put this in the facts, and make that finding. Because there is no finding of causality from the use of expropriated property. That is what has the cause of direct effect. There's simply no finding. Do you draw a distinction between remittances and the sales of U.S. imported goods, with respect to this point you just made? That the district court, in your view, didn't make the right finding in terms of causation? Well, I think the key on the food stuff is that the district court said that further factual development might lead it to conclude that the food stuffs were not a direct effect. It stated that explicitly. And he said, well, so far, what you're hearing from me is not enough to dismiss this action. But it explicitly said further factual development might lead me to a different conclusion. And so a remand for that purpose, as well as the purpose I just mentioned on the remittances, seems to me entirely inappropriate. Why do we need to remand at all on the food stuffs if the district court is already going to do what you're saying we should remand for the district court to do? I thought what you just said is that the district court is already saying that it's going to conduct further discovery on the food stuffs. And that further discovery might end up reaching a resolution in your favor. Why would we remand for the district court? I mean, why would we need to tell the district court anything on food stuffs if it's already going to do what you think it should? I think that's a fair point, Your Honor. It's a peculiar posture because it's a lot further. But I think on the Western Union, it's quite different. I think the court should identify the issue which the district court should look at and decide upon, which is whether there's causality based upon the use of some service stations to pay out Western Union remittances. And are you asking for a reversal and entry of judgment in your favor on jurisdiction? Or are you just saying, it sounds to me that the primary submission you're putting forward is that you ought to have a chance to go further in the district court to meet your burden to show that the exceptions to the FSIA are inapplicable. We argue, Your Honor, first of course, that the expropriation of exceptional loan controls, and that ends the case. When we get to commercial activity section with respect to scheme acts, which is the only party that the court reached on the commercial activity exception, that we do argue that on the record, the judge should have dismissed the claim under the commercial activity exception. We also argue that the district court, if that's the one, it shouldn't have dismissed, it shouldn't have denied the motion. And it should continue to examine the question, which it failed to recognize as the key question. I have one more question. Yeah. And it deals with the Foreign Claims Settlement Commission. Yes. Why is it that a waiver or an exception to any sovereign immunity that Cuba has, that the federal government has authorized the commission to award damages against Cuba and in fact did it to the tune of, what was it, $71 million? When was that? The commission was set up in 64, I think, and the decision was published in 67. It wasn't a decision. But why isn't that a waiver or a disregard of sovereign immunity? It's not an award to the plaintiff. It's a certification to the Secretary of State of possible use in diplomatic negotiations with Cuba, state-to-state negotiations. It's not an award. You can't sue on that. It's a certification to the United States, to the State Department. Well, you can now. You can sue on it now. No, I don't. Title III entitles you to a presumption that your property has been taken and the amount of damages awarded by the commission. That's a suit on that award. But you have to show it's your property. And they haven't shown it's their property. Well, not under FISA, but certainly it showed almost conclusively a presumption that it was their property. Otherwise, the commission could not have rendered the award. The presumption you're referring to, I believe, Your Honor, is about the amount of damages. But the foreign claim settlement the commission did was fine. It was totally within the statutory mandate to tell the Secretary of State. What it did was that Exxon, as a shareholder of a corporation whose property was expropriated, suffered indirect economic injury, damages. Well, maybe it did. Maybe the Secretary of State someday will race that with the Cuban government. But that's not his property right. And remember when we were talking, you know, on Helmuth, I made it very clear, you know, we're talking about a particular kind of right here under the expropriation section. We're talking about a property right. The indirect economic damages, it's not a property right under international law, possible mistraption. Under Title III, do you know how property is defined under Title III? I have read it, Your Honor. The term property means any property, including patents, copyrights, trademarks, any other form of intellectual property, whether real, personal, or mixed. Any present, future, or contingent right, security, or other interests therein, including a leasehold interest. And you say that doesn't cover the loss that Exxon claims? No, those are SOSA's property. Those are SOSA's property. It owned the property. It had all these things. The question becomes, and the notion that the shareholder has property interest in the corporation's property is flatly contrary to possible mistraption. And all that claimant can rely on is less speciality, you know, treaty provisions negotiated to get more of them on customary international law. Okay. Can I go back to just my book, and then we'll give Exxon a chance to argue? Unless my colleagues have further questions. I just have one question on commercial activity. And on commercial activity, and put aside remittances for a second, and let's talk about the food stuffs. They, CMEX has a supply contract with Alamport, and Alamport gets goods from the U.S., and then CMEX ends up taking those goods and selling them at best stations, as I understand it, at a high level of abstraction. Is the reason that CMEX has a contract with Alamport so that Alamport can get goods from the U.S., since Alamport, as I understand the record, is the only entity that can import from the U.S.? CMEX's contract is not for Alamport to get goods from the United States. I know that's right. Alamport, I think, is important to note. I mean, Alamport imports food from the entire world for the entire country of Cuba. I get that. I guess my question is this, though. I think I do understand that, and I appreciate the clarification. But because Alamport, as I understand it, is the only entity that can import from the U.S. It may import from all over the place. But because it's the only entity that can import from the U.S., is the reason that CMEX has an agreement with Alamport so that CMEX at least has access to U.S. goods, since Alamport is the only entity that can get goods from the U.S.? There's nothing in the record that CMEX cares at all where the food came from. It has a supply contract for not the oil service station. CMEX wants to make a tremendous distribution network. It says, in the coming year, we want 50,000 chickens. It doesn't care where the chickens come from. There's nothing in the record indicating where the chickens come from. So then you have the question of causality. Mr. Krinsky, isn't Alamport also the exclusive importer from elsewhere? It is the importation arm, no? Yeah. If CMEX wants to import from Spain, does it go to Alamport? Probably, Your Honor. There's nothing in the record that. It's a little bit more complex. Okay. Alamport is the major, by far the major, importer of food from around the world from Cuba. Is it not entirely foreseeable that as a result of CMEX's purchase orders, Alamport will import goods from the United States? I would say, Your Honor, on this record, it's entirely not foreseeable. Alamport makes its own. The record is, and maybe when you follow up after that, and I think that's the District Court's alluding to, we're wanting to have more development. The factual record is Alamport makes its own decision. It's totally independent of whether CMEX or anyone else is going to carry the goods. About how much of the country's needs is going to be put from the United States and it's mostly overwhelmingly not from the United States. So the question. When you say mostly overwhelmingly not from the United States, do you mean with respect to the service stations or with respect to CMEX as a whole? The whole country. Do we know with respect to the service stations? No. We don't know. We don't know. That's not on the record yet. No, no. And the record on food stamps, I would suggest, is seriously underdeveloped. And the District Court, the decision, and the District Court recognized that. Make sure my colleagues don't have further questions from you. We'll give you a little time for rebuttal. Thank you. Thank you, Mr. Kinski, Mr. Davidson. Good morning. I'm pleased to report Stephen Davidson for Exxon Mobil Corp. The plaintiff below, Appley, and Crossman. And I will discuss our response to Mr. Kinski's appeal and our cross-appeal, preserving a couple minutes of rebuttal for our cross-appeal. As is clear, there are, according to Exxon Mobil, two pathways for subject matter jurisdiction. One is under the FSIA and the two exceptions we say apply, the commercial activity exception and the expropriation exception. Another is a direct case under Title III itself. And I'll take up that argument second, but that argument is that under Title III, there has been a waiver of sovereign immunity. And that we don't need even to resort to the FSIA. We can just deal with Title III. The judge below ruled against us on that point. And we find the alternative as to both relief under the FSIA and Title III itself. And within the FSIA, we said two exceptions apply, the commercial activity exception and the expropriation exception. So turning first to Mr. Kinski's appeal and our response to that, we would submit that the district court got this right on the commercial activity exception, and principally by focusing on trafficking. Because trafficking is what we are entitled to sue under. Not possession of the property, but sue as an American citizen, sue those who traffic in our property. And I believe the district court in his ruling was correct when he said, quote, the act does not grant a cause of action for mere expropriation of property. Rather, liability under the act attaches only when a U.S. person's property has been confiscated and trafficked. Trafficking in expropriated property is the gravamen of the Title III claim. We would submit the district court correctly relied on SACs in dismissing, as you heard in the argument this morning, the one element approach as flatly incompatible with the court's precedent. And, your honors, the trafficking activity we have sued under is fundamentally commercial. The remittance program, the food stuff program. So we would submit we fall squarely within the ambient of the commercial activity exception. And, as I think was mentioned earlier in argument, the breadth of the definition of trafficking and property under a health burden is very broad. It includes a wide range of covered commercial acts, as well as a catch-all provision for engaging in commercial activity using or otherwise benefiting from confiscated property. And then, if you look at this court's precedent and the Supreme Court precedent, we believe we fall squarely within those decisions with respect to the commercial activity exception. We principally rely on wealth over, direct effect when money was paid into the U.S., sovereign acting as a private commercial act, successful, which has been discussed and raised by Judge Ballard, and involved expropriated property, but still there was a commercial activity. And then, we would look at your direct effects jurisprudence, principally in Cruz-Senex and in the AIT interstate. So in our cases, we have said that nothing in the FSIA commercial activities exceptions direct effect requirement requires that the direct effect harm the plaintiff in the United States, which is helpful to your claim, but I don't think we've ever found a direct effect where the act upon which the action is based, the gravamen, the direct effect that it has in the United States, doesn't even harm, doesn't cause harm in the United States. Is there harm in the United States from the Cuban market being available to the United States, Western unions, United States food stamps? Your Honor, I would respectfully submit that that question is phrased too narrowly, in connection with your precedent. The direct effect can be manifested through what Judge Mehta called, and I think is also in the EIT case, the direct negative economic effect. That is, funds flowing out of the United States, or funds that were supposed to be paid into the United States, and weren't. So it's not so much, with all due respect, I wouldn't necessarily characterize it as harm. I would say effect. And I would fasten on to the word effect, because that's the word of the statute, not harm. And your jurisprudence allows for there to be a negative economic effect. And I think if you look at what Judge Mehta analyzed the record, and analyzed these two… Negative, I mean, I guess negative and harmful are relatively synonymous. But negative in the sense that money flows out of the United States, or money that should have flown in doesn't, like in the bonds case. But those are really two different things from the perspective of negative. If the U.S. is supposed to receive funds that it doesn't receive, well, that's both a non-action, so negative in that sense. But it's also bad for whoever wanted to get the money. Whereas here, it's a non-action in the sense that the goods are – the demand is being created to pull goods out of the United States. But it's not adverse in any sense because, as I said, it's a bigger market for the purveyors of those foodstuffs and services. Your Honor, what direct effect requires is that there's conduct specifically – economic conduct specifically targeted at the U.S. and that there is an effect in the U.S. of that. And I would submit that harm isn't necessarily what the FSIA is aimed at with respect to direct effects. Because, as Your Honor mentioned, there are cases under the FSIA where simply being – where being harmed isn't a direct effect. Like, you know, there are a number of FSIA cases in which a plaintiff sued. I mean, one could say, in fact, you know, the plaintiff is injured in the United States, but that's not a direct effect. It's not necessarily harm. It's an economic effect. I mean, in your view, in other words, it seems to me that your argument is that it could be a beneficial effect because the purpose of the FSIA exception is to establish an economic nexus to the U.S. that it seems fair to hail the defendant sovereign into U.S. court. And even if it's a beneficial effect, that's still an effect of the kind that justifies bringing the sovereign defendant into U.S. court. Is that your view? Yes, Your Honor. Even if the cases don't deal with situations in which there hasn't been a harm, it doesn't matter because even if it's a beneficial effect, it's still an effect for the language of the statute and for the underlying purpose, which is to make sure that there's enough of a commercial nexus to justify bringing the sovereign defendant into U.S. court. I would agree, and I would also remember dealing with a fairly novel situation in that the actual cause of action is tracked. So this case, in some ways, is unlike FSIA cases that have preceded it because it's on this special kind of cause of action of trafficking rather than a reaching contract or other kinds of things. It's a very broad remedy that applies to a lot of different conduct. Is there another case, for Judge Fuller's question, is there another case where it actually went in this direction, where one could conceive of the commercial consequences as being beneficial to the U.S., but nonetheless, it's the cases for establishing jurisdiction? Well, if you look at the Webster case, I mean, there was direct effects. I mean, some of the bond payments were made, so there was money going back and forth. I mean, ultimately, they sued when a bond payment was missed, but I would submit that the direct effect is still satisfied even if a bond payment is made. Just stepping back, I take it you agree that the act that causes the direct effect of the United States has to be the act that is the gravamen of the claim. So here it's the running of the commercial use of expropriated property to run the series of convenience stores in Cuba. So that is the gravamen. Right. You know, trafficking, and then here, we would say that translates into the use of the confiscated property for the commercial purpose. Remember, the property we're talking about with respect to these two, the food stuffs and the remittances are these confiscated service data. Right. And what about this, what just appears to be quite incidental amount of remittance business that is run through the CMEX owned and the particular stations that, at least as far as defendants can tell, that were the stations that were expropriated from SOSA 4 to 10? A few points in response to that. First, you know, one that Chief Judge pointed out that we haven't had discovery. We don't know actually. Did you preserve a claim that you need discovery on that? Yes. But we believe that, you know, to sort of have our cake and eat it too, it's also unnecessary because 4 to 10 is enough. Why? Why? Because remember, the standard here is non-trivial. And let's talk about the remittance program. In the 2018, there was $3.6 billion. Overall. Overall. Do we know the quantity? We don't. And there are, from the evidence below, there are 66 Western Union machines or remittance machines at CMEX stores. And defendants have admitted that 4 to 10 of those are in confiscated service stations. That's the rent. And then the question is, is that non-trivial? There's literally billions of dollars going into these 66 or over the 502 remittances, 66 of which are at service stations. Any one of these, 4 to 10, could be hundreds of millions of dollars a year in money that's going through. And I would submit it's very unlikely it's not in several, if not tens of millions of dollars. And the question is, is that non-trivial? And we wish the record in some ways was better, but we, of course, don't have access to these stations. The discovery wasn't, you know, the judge said we have enough to find non-trivial without doing this discovery. Would it matter whether it's part of CMEX's business plan or whether it's only part of, what is it, in CMEX? In CMEX. That some of these remittance receipt sites are in service stations. I mean, it seems to me that it's clearly part of CMEX's commercial use of the property that it sells food stocks. Right. Less clear that it is sort of part of the program of CMEX and running these that it allows people to pick up their remittances. Are they accommodating somebody else's business plan? Does that matter? Well, CMEX, I mean, it might be thin CMEX, but an entity in the CMEX chain has a contract with Western Union to provide these remittances. Right. And they decided that it's in these service stations, among other places. There are 500 locations in Cuba, 66 in service stations. So I would submit it's part of their plan to have these in service stations to allow for greater convenience and greater use of the remittance stations. Do we know whether these 4-6, I don't think we do, but are rural, remote, or? I don't know the answer to where the 4-10 is. But we would submit that it's non-trivial. What's your response to CMEX's argument that the way to look at the 4-10 is to ask whether that small number of stations, and I mean small relative to the overall number of stations, actually causes the outflow of dollars from the U.S., of funds from the U.S. to Cuba? Well, we know that they, by their own admission, their 4-10, they've used the Western Union Remittance Program. So I think we can take it as a given there is some money flow. So the question, only question in my mind, is does that get over the non-trivial fall? Because it's certainly flowing, and as I said in response to Judge Clark's question, we believe the judge is right. It's clearly non-trivial. But is that really answering the question in the sense that if the government of the claim has to cause the direct effect, then wouldn't the question be would this, I mean it seems reasonable to assume that the same amount of remittances would be sent, and that the people in Cuba who are picking them up would just have very marginally fewer choices about where to do that. So isn't there some at least modeling needed to say whether there is any effect on the outflow of remittances from the United States of the availability of these 4-10 stations? At least that's what I take, you know, the defendant's argument on this debate. Well, I think to the extent we're getting into purpose, I think the case law is clear that we don't necessarily have to... Does it cause a direct effect? That's what we're focusing on. Does it cause this effect? Again, there are 4-10 stations where, I mean, could you, I guess your hypothetical, your question presumes, well, if there weren't those 4-10, would the money still go anywhere? Yeah, same amount of money. Well, the first answer is I don't know, because these 4-10 may be in some place where the people who use them can only access them. They don't have a car, they walk there, or, you know, it's on the other side of the aisle. So there are plenty of explanations as to why the 4-10 are essential to some amount of commerce being transmitted. And I think one could perhaps take the logical progression that if there are fewer of these, there'd be fewer transactions and less money transmitted. But I don't know, frankly, if the standard would be so exacting that we would have to prove absence of 4-10, would there still be money? I mean, I think what we need to prove is what we did prove and what the judge found, which is 4-10 is not true. Do we have any idea what the transactions are between Western Union and CIMEX? Does Western Union rent space or do they pay a license fee or whatever? I don't know the exact particulars of that relationship. Well, I wonder whether it matters, because it seems to me if there was a fee, somehow or another rental or leasehold or whatever, that if it's not turning a profit, Western Union would shut it down. Well, I mean, I assume, I mean, I think it's a given that Western Union makes a profit on it. I mean, they charge a fee for the transmission that comes out from the sender or the receiver. And I don't know whether CIMEX has to pay Western Union a fee or vice versa for using their facility. I was going to shift to foodstuffs. So if we just shift to foodstuffs for a second. Sure. A couple of questions. First, just as a setup, does foodstuffs matter if there is jurisdiction by virtue of remittances? And let's just, I suppose practically it could matter because if in further discovery it turns out that the remittances doesn't work, then you might need foodstuffs. So I take that point. But just, if you divorce it away from that, does it matter? Does it add something to the substantive Title III claim so that we should reach that issue? And second, if we do reach it, then on foodstuffs, why isn't it significant that Alamport is making, as far as the record now shows, entirely independent decisions about where the goods will come from? And that CIMEX, from everything we can tell from the record, doesn't care whether they come from the U.S. It's just by virtue of the independent decision of Alamport that anything from the U.S. is being sold at this location. As to the last point, Your Honor, I want to submit, with all due respect, that's not what the record said. Judge Meadows says CIMEX, quote, exercises some degree of discretion in carrying U.S. goods for sale in its convenience stores. CIMEX specifies the products and their amounts that it will purchase from Alamport. And that's in the joint appendix of TAA 2073-74. I don't understand why that answers that, because all of that could be true. And what CIMEX says is we want X product here. I don't care where – I don't – frankly, just being a consumer, I'm not sure I get why the seller wouldn't care where the beer comes from or even what brand it is. But let's just stipulate that that's what the record says, because I think it is what the record says. And they just say they want a product. Name the product. I don't care where you get it from. I don't care what brand it is. I don't care what company manufactures it. Just go get me that product. And at that point, I don't think CIMEX is saying we care or is doing anything to indicate that it cares whether the goods come from the U.S. That's all an independent decision by Alamport. Again, Your Honor, not to quibble, but the record, I don't believe, the record says CIMEX exercises some degree of discretion in carrying U.S. goods. Well, of course they do, because, I mean – Well, maybe I mean. But I don't – but you have – I don't think you can just point to the statement in the district court opinion because the district court has to be relying on something. And I don't think that statement taken at face value tells us that CIMEX actually cares whether something comes from the – of course they have discretion. I mean, they could tell Alamport in their negotiations we do or don't want goods from the U.S., we do or don't want Tyson's Chicken as opposed to something else. We do or don't want Budweiser. They could do that. But – so they have the discretion. But I don't think – as I understand the record, based on that second declaration, the state of the record is that CIMEX just doesn't tell Alamport anything about what brand it wants or where the product is supposed to come from. It just gives it a finite number of a particular product. It's entirely – let's just assume that that's right. It's entirely Alamport's decision on where to get it from. If there's something in the record that just tells me otherwise, I'd be curious to know what that is, but I'm not aware of what that is. And if – besides the district court statement, because that's – for me, at least, that's not persuading me that the record says otherwise. So either let me know what in the record says otherwise, or if not, why is it still enough that CIMEX does – I think everybody agrees CIMEX ultimately does sell goods that come from the U.S. That's absolutely going on. But CIMEX apparently doesn't care whether the goods come from the U.S. That's all Alamport. All right. Well, as to the record, the Almana declaration is what we have, which is the Joint Appendix of 2074. And according to her, American products reach CIMEX shelves only when CIMEX is placed in order for goods. Alamport, in turn, buys some of the goods that CIMEX has ordered from the United States that CIMEX makes the business decision to carry. So I think, Your Honor, in response to the factual predicate part of your question, you know, that doesn't probably carry me all the way home in that CIMEX is making a decision to buy products from the United States. Right. But they certainly know that happens, and they're not stopping it. And they're shelving – and they're – you know, they're stocking their shelves with these products that come from the United States. So I would say it's more than just happenstance, because to use your example, if they didn't want to stop glove laws, they could have said, stop bringing that from the United States. But they don't. And they know that products are brought from the United States. Money is going into the United States, which we would submit that commercial exchange as a direct effect. And also, Your Honor, I would direct your attention to the EIG case, you know, the Brazilian Petrobras scandal case. The investment loss was actually booked in Luxembourg in that case, but the funds ultimately came to rest in the U.S. And you remember, in that case, the court said it doesn't matter if these ricochet around the world as long as there's an effect found in the U.S. From that, I would submit, Your Honor, that the courts are not as concerned or mindful of this sort of purpose element. It's like, was there a direct effect in the United States? How did it come to happen? And even if there are other effects or even if there's this ricochet effect, it's still enough. But it has to be direct still. And I guess that's where the rubber hits the road on this, I think, is whether it's a direct effect of the act undertaken by the defendant. And if the act undertaken by the defendant is the sale of goods on his property that were imported from the U.S., does that act have a direct effect on the U.S. where the defendant, based on the existing state of the record, isn't caring whether the goods come from the U.S.? Well, to me, Your Honor, the answer to that question is – and I hate to answer the question with part of the definition – but is there actually a direct effect? And whether they purposely bought U.S. products or were happy to buy U.S. products or happy to sell them, the question is, was there an effect here? And under the sort of definition that I was working with you, Your Honor, says the Lord, that there is, because there's this commercial exchange, funds flowing in, and an impact in the U.S. So do we know whether CMEX has to use hard currency from any foreign country from which it buys goods, or are there countries where it doesn't have to use dollars? I imagine it has to use – to buy the products from the U.S., certainly. But I'm wondering whether it has any reason to buy less from the U.S. where it can because of terms. I don't know. So we haven't talked with you about the expropriation exception in violation of international law. And I haven't heard from you how you deal with the problem of international law's distinct treatment of shareholders from the SOSA property owner itself and the parcel and extraction hurdle. And there's some, you know, claims that – some of the arguments that you have raised in response are arguments that you did not preserve. And I would just like to briefly hear from you. Sure. Let me see that. But if I could, the one question I didn't answer, Your Honor, is do we have to have both? Yeah. Either one is sufficient in my view for there to be a direct effect. We'd like to have both. As lawyers, we always want more. But either one would be sufficient in our view. But does it affect – so why would you like to have both? Let's suppose just by hypothesis, to seem a little resistant, but just to carry out hypothetical, let's suppose you win on remittances. Does it matter to you at all? And let's suppose that win is – it's invulnerable. Does it matter to you at all for purposes of litigating your Title III action whether you also win under the food stamps? In that hypothetical, I don't think it would. I mean, as lawyers, we're almost never willing to make that substitution. I'm just wondering what the legal consequence is for litigating your – or even practical consequence is for litigating your Title III action, which is what we have, ultimately, of having more than one foundation for jurisdiction under the FSIA. It seems to me that you think that as long as you get in the door under the FSIA, it could be one gas station that's doing remittances of a non-trivial amount. And then as long as you have that, and as long as that doesn't get overturned at some point, then your Title III action just goes forward as it would. I believe that is so, but we haven't reached that point. So we're defending them both. Okay. So, Judge Gillard, in terms of the expropriation exception, again, just to set the stage, that's our second basis under the FSIA claiming immunity to these agents or instrumentality. And the question in particular is what we have complained of a violation of international law. I mean, let's just – we'll deal with that element. There are other elements to the exception, but that's really the one that's before you. Before we even get to Barcelona Traction, we would say, the point we've made throughout the proceedings and in the brief below, is that one element of international law in terms of finding whether this is a violation of international law is that the taking is not discriminatory. And before we even get into shareholder rights and Barcelona Traction and what we can do, this taking was discriminatory. If we look at Cuba Law Number 851, which is the operative statute that took the property, which is in the Joint Appendix of 1127, that was specifically targeted at American companies and particularly mentioned the plaintiff. So we would submit, even under Barcelona Traction, Helmut Kampain, and the remainder that talk about the entire enterprise section that – or the requirement of there being an entire enterprise. We don't even need to get there because this was a discriminatory taking. But you do, because it violates international law. And the question then becomes, whose international law rights did it violate? And under the distinction between the corporation and its shareholders, it would seem to be the corporation's international law rights. So the corporation, even though it's Panama S.O.S.A., it violates Panama S.O.S.A.'s rights that its property was taken for a reason that had to do with discrimination against its American owners. But that doesn't change the nature of the shareholders' rights as distinct under Barcelona Traction and Diallo and the international law generally, right? So it doesn't get you around that problem, Barcelona Traction problem. Well, but even if it doesn't, that Cuba is unlawfully interfered with Exxon's direct rights as a shareholder. How is that? By interfering with our beneficial ownership and control of Exxon and by denying Exxon the economic value of its shares. So we would submit that as a shareholder, we've been injured, and by this – So that's just a diminution. By this discriminatory taking. Right, that seems like that's just a diminution. And unless there's something that you're asking for in terms of inquiry into municipal law, Panamanian law, that would fill out our understanding of what the shareholders' rights were and how they were, in fact, obstructed. I don't see the distinction yet from Barcelona Traction. Well, we can also question whether Barcelona Traction sets an immutable rule that it has to be an entire case. You know, in that case, they posited that there needed to be, but I'm not sure international law so requires, and that our indirect rights as a shareholder are at issue. And I believe that under international law, which we've cited in our brief, and, you know, particularly in relying on the ICPSC cases and the Iranian claims tribunal cases, that our indirect interests are recognized. A lot of those have to do with rights that flow from a bilateral agreement. Another particular reason was agreement, not international law writ large. And so if we discount those for that reason, you may have a response to that, but let's just suppose we're discounting for that reason. There's still the question under what everybody agrees is international law of whether the entire interest has been essentially annulled. And on that, as I understand this course of proceedings, you never made an argument about that in the district court or in our court until the reply brief. I think that's fair, but the evidence we relied on was defendants' own evidence, which, in fact, was put into the joint attendance by defendants. But I think, really, for forfeiture purposes, even if the evidence was there to be had or an argument to be made on the basis of it, we expect parties to make the argument. And I understand that, Your Honor. And I would submit here that given the knowledge of this evidence and the facts that have been before the party, that any notion of undue surprise or other types of procedural argument would not be well found. So you're requesting that we would not deem that argument to be forfeited here? Correct. And that's, you know, you want to finish? Let me just finish on that, if I could, Your Honor. Just, you know, the issues related to that have been, you know, put before you in their most misdiagnostic in our response and in the potential service. Does FISA or Pfizer or whatever contain a definition of forfeiture? Does the FSI contain a definition of forfeiture? I'm not sure, Your Honor. But. Suppose it doesn't. Why, then, should not property be defined in accordance with title three? Your Honor, we think. The purposes of making the determination about whether the property has been taken in violation of international law, you have to have some idea of what is meant by rights and property. But I don't see why the definition has to be in terms of some amorphous international law when you have a definition of property and the very statute that gives you the cause of action at a minimum. Well, we would agree, Your Honor, and push that point a little further, too. And I might add that the definition of property is employed in title three for the purpose of determining whether there's been an expropriation, whether there's been a confiscation. Right, Your Honor. And then the claims commission has certified that amount, and then title three gives us a right to enforce that. And if I could talk briefly about title three, as you know, an alternative basis that we've posited is that we have subject matter jurisdiction under title three. And title three itself gives us a right to sue without regard to the FSIA. So that if we were correct, we wouldn't even need to deal with these questions of exceptions under the FSIA. And our argument is fairly straightforward on the Helms-Burton Act's subject matter jurisdiction. One, it allows for suits against agencies or instrumentalities of foreign government. And two, the 28 U.S.S. Codified and 28 U.S.C. 6082, it goes through who we're entitled to sue, and we're entitled to sue any person. And that person is defined to include an agent or instrumentality of the state. So, but that isn't alone enough for the extent of our argument. The question then becomes, because there's obviously ample jurisprudence, starting with Armada Hess and other cases, that say the FSIA is the only basis under which you can sue a site. And there are cases, like Armada Hess and others, where they have found that other claims can't be brought outside of the FSIA. Here we would submit this is a circumstance under which, even with Armada Hess, that we should be allowed to proceed with subject matter jurisdiction under Title III itself. The district court relied upon that case, I think was decided in 1989, where the Supreme Court said that the FSIA is the sole source for allowing jurisdiction for foreign sovereigns. And it does seem to me that that's a misnomer in itself, because I don't see sovereign immunity as a jurisdictional question. It can be waived, but the court was a lot looser in those days in labeling things from jurisdiction. But nevertheless, that was decided in 1989. This statute came into effect in 1996. So the statement by the Supreme Court, which has been repeated, could not possibly have anticipated a suit of the sort that you're bringing now under Title III. And the other thing that I'd like you to address is that the fact of the matter is that the Title III is a specific statute aimed just at Cuba. FISA is aimed at the world. And there's a doctrine of interpretation that says that the specific controls over the general. And I'm not sure that you've made that argument, but I'd like you to address it. Well, yes, Your Honor. We believe that as a later enacted statute after Ahmada Hess, which is the 1989 case, and with it specifically tailored to this precise situation, that it doesn't run afoul of the Supreme Court's teachings on FSIA. And in fact, if we dive more deeply into Title III, I think that position becomes even clearer. Because if you assume that, as the district court did, we can only sue under the FSIA, there are a number of references within Title III that would then be unnecessary. And I don't think we should conclude that Congress put unnecessary references. For example, in Title III, there's a particular provision that says, as to ESOP, it's in the procedural requirements section of Title III, which is at 28 U.S.C. 6082C. There are particular provisions there that have been added to deal with service of process on ESOP. In that section, the Congress said that service of process over an agency or instrumentality of a foreign state shall be done like it is under 1608 of Title XXVIII, in other words, the FSIA. So, and similarly, there are provisions in this procedural section that deal with attachment and execution against human property. 6082D deals about enforceability of judgments against the human government and says, if there's been – essentially, if there's been a regime change, you can't enforce a Helms-Berger judgment against the new government. And there was a provision that was in 608 – in section 302E, which then became 6082E, that became codified in the FSIA that dealt with certain property of the human state that could not be attached. That is diplomatic property. Diplomatic missions. Right. Facilities. So my point is, if Congress intended plaintiffs like us, in order to sue an agent or instrumentality, had to go under the FSIA, it would have been completely unnecessary to put these other provisions in Helms-Berger. Because in Helms-Bergen now, there are specific provisions that say, if you sue an agent – one, you have the right to sue an agent or instrumentality. Two, if you sue an agent or instrumentality, these are the things we've taken from the FSIA that you have to follow. If we – and three, it assumes that a judgment will be enforceable, which is contrary to the idea that sovereign immunity would protect against it. Because as you know, under the FSIA, there are a number of provisions that deal with how to enforce a judgment against a sovereign or its agents or instrumentality. If we were only to follow the FSIA, these provisions that I'm going through would be unnecessary. And there's also a catch-all provision in the – that describes the interplay between Helms-Bergen and the FSIA in Section 1, 302c1. Why is it – I don't understand the unnecessary point. I mean, for example, C2, which is service of process, and it says you'll serve process as process is served under the FSIA. I mean, it might be unnecessary in the sense that you're just doing what the FSIA says you should do for service of process. But it's also not doing anything different. So it's entirely consistent with having the FSIA as the fondant jurisdiction. Here's what I take from that. If what the district court said is actually the law, that we can only sue under the FSIA, and that Helms-Bergen did not create an ability to sue a sovereign, you wouldn't need to put these provisions in because they are already found in the FSIA. What I would submit is that the reverse is true. Congress knew that we could sue an agent or instrumentality without regard to the FSIA. So what they did was they imported a handful of provisions from the FSIA and put them in Helms-Bergen. Because if they didn't do that under our view of the world, we'd be able to execute on our judgment against Cuban diplomatic mission. Could you go against another sovereign under Title III? If another sovereign was trafficking in our property? Yeah. Do you think that Title III – if Title III is an additional fondant jurisdiction, entirely regardless of the FSIA, as your argument presupposes, suppose some other sovereign comes into possession because of some agreement with Cuba, a property, and is engaging in trafficking on that property. Do you get to go against – I think that – one, I would think the contemplation would have been that Cuba is the only sovereign in TAMP when it comes to Helms-Bergen. And then your question would be, hypothetically, if another sovereign was trafficking in expropriated property, could we sue them without regard to the FSIA? We would submit it does create a cause of action. You couldn't. You could not sue another sovereign. You can't even sue Cuba under this. We can just sue an agent or instrumentality. That's right. All you can sue is an agent or instrumentality. The person is defined as an agent or instrumentality. Okay, an agent or instrumentality of another sovereign. Let's say of Venezuela, who has – to whom Cuba has sold some, you know, oil infrastructure. If it were an agent or instrumentality of a foreign state? Would that proceed under Title III, I think the question is, or would that proceed under the FSIA? Well, we haven't considered that possibility yet. We would submit that Title III gives us a right to sue. I think in that situation, you know, the question would be, like, did Congress contemplate a waiver of sovereign immunity with respect to someone other than a Cuban agent or instrumentality? Well, if the Cuban government had brought in some entity from Russia to operate the oil refinery, I don't see any reason why you would resist that. I think it's absolutely covered by this. It would fall under the definition of a person, and Congress did not make any other provisions with respect to certain Cubans, you know, other non-sovereigns. But we would have – in that hypothetical, Your Honor, we would have to follow the provisions that are important to Title III from the FSIA, like Van U. And remember, there are other provisions there. It's not the hypothetical part. Can I take you back to the question I asked earlier and apply it to this, too? On this axis of your argument that there's an independent basis for getting jurisdiction over a Cuban entity via Title III, does it matter to you whether the way you get to go forward in your Title III action is that Title III creates jurisdiction or that it's a remittance at one station that gets you under commercial activity? Does it matter? It doesn't matter, and it would be – I mean, we would prefer to go simply under Title III because then we wouldn't have to deal with the commercial activity and remittances and all these other things with respect to the creation of jurisdiction. So why would you – but I don't understand why you'd prefer it. I mean, just to give you the cleanest hypothetical, I'm just hypothetically guaranteeing you a win under one of these. Do you care? No. Okay. I just wanted to understand the way you're conceptualizing this vis-a-vis – I like the Helms-Burton argument, but no, I don't. Okay. So if I could save a few minutes for rebuttal. Let me make sure my colleagues don't have additional questions at this point. Sure. Thank you. Thank you. Mr. Krinsky, we'll give you three minutes for rebuttal, and we'll give three minutes for the cross-secular rebuttal. Thank you, Your Honor. I want to try to cover a couple of points. On the record fact, what strikes me is that a lot of the inquiry and a lot of the arguments is on the question of a judgment that did not find. What is the effect, if any, caused by the 4 to 10 service stations? What is the effect of CMEX carrying these puts on their shelves? And there's a whole lot of – and we say on the record you shouldn't point on both points, but in any event, he did not make the findings which are necessary to sustain direct effect. And so at a minimum, we would suggest a remand for that if those determinations is necessary. Let me see. Also on the direct effect, the judgment did mention trivial, but that wasn't in the sense of causation. He assumed incorrectly, as error, we believe, that setting this – what the Union 15 Act setting up these channels of remittances was the effect, and the remittances flowed as a result of that. That was the effect. And then the question he asked was, well, the amount of those remittances trivial. Well, that's not the question. The question is whether Westby Union thinks CMEX setting up these channels of remittances is a direct effect of CMEX using these 4 to 10 stations. And so this trivial point he addressed is actually a different point. As to the 4 to 10, I want to make it clear on the record, we have not admitted that we're even 4 to 10. What we said is there are no more than 4 to 10 because we've looked at the property records, and except for those 4 to 10, we see no trace of SOSA land. We haven't admitted even 4 to 10. On the question – also on the property right question about the taking of the property by the entirety, Judge Benson did make findings on that, and on the basis of absolutely sufficient evidence. He said management and control was not taken. That stayed with SOSA, with Exxon as its shareholders until 2012. And he said because there was property and business outside of Cuba – and he pointed to Panama and Jamaica – the entirety of the business was not taken. Exxon's ownership of the corporation had not been completely destroyed. That's the standard the United States has maintained and which Helmut accepted. Its shares were not useless. It was still operating as a company. So on the question of rights under – shareholder rights, it seems Judge Mehta has laid out the rest of his findings. Unless the plaintiffs can argue, it was clear error, and it was not clear. Thank you. On this business of Title III and the service provision, the answer is that easy. It was abundance of portion. Title III, when that provision was put in, it was when the jurisdiction of Title III was changed from exclusive federal jurisdiction to state court and current jurisdiction. And so that abundance of portion, Congress may have been concerned that state courts would not issue default judgments without paying attention to the service provision. And, in fact, it had been wronged by the State Department. There were going to be lots of default judgments, again, by agencies. And so that's – There's no concurrent jurisdiction. Yes, there is. But if you bring a case under Title III, there's a provision in Title III that bars you from bringing an action under common law, any other federal law, or any state law. But it can't go in state court. Title III laws can't go in state court. They have to go in state court. But it would have to be under Title III. Under Title III? Yes. Yeah. The – I think to address your question about whether Exxon should care about whether the judgment is under Title III or the FSIA, well, I think the answer is that they should care. Because if it's under Title III, they cannot obtain execution on the judgment except by conforming with the FSIA's provisions about existing online establishes immunity for jurisdiction except – execution. I'm sorry. Except when the judgment is under one of the specified exemptions – one of the specified exemptions from suit. So Title III judgment gets them no execution. Two other points, because – If you could be brief, please. Yes. I don't need – just to mention in your honor, on expropriation exception alone controls, we argue statutory construction and we argue international law. And we do believe that they are both really quite important. Statutory construction expropriation exception addresses this very conduct. Operate – agency engaged in commerce operating expropriated property. And it lays down very hard, specific conditions for a lawsuit on that. Commercial expiry exception doesn't address that. It's – in its literal terms, it sweeps as far as operation of expropriated property and yet without the conditions being conformed with system code. One – thanks for international law, your honor. We suggest that in this area particularly, it is really important and should be paid close attention to. Allowing suit against – by a former owner, whose exon is not actually, but allowing suit by a former owner against an agency for using expropriated property commercially, the thing that's demonstrated would be contrary to international law at the time of the FSIA's enactment. There was no abrogation of immunity for that. So we would be placing this lawsuit well beyond a radical departure from a serious national law. Thank you, your honor. Thank you, counsel. Mr. Davidson, we'll give you – okay. Thank you. Thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan, Pillard, Randolph